**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

|                        |                                    |
|------------------------|------------------------------------|
| SUSAN SIEVERDING,      |                                    |
| Plaintiff,             | No. C18-1030-LTS                   |
| vs.                    | **MEMORANDUM OPINION AND**         |
|                        | **ORDER ON DEFENDANT'S**           |
| HUMACH, LLC,           | **MOTION FOR SUMMARY**             |
| Defendant.             | **JUDGMENT**                       |

———————————————————

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................. 2

II.  PROCEDURAL HISTORY ................................................................... 2

III. RELEVANT FACTS ............................................................................. 3
   A.   Background ............................................................................... 3
   B.   Sieverding's Intermittent FMLA Leave Begins in 2015 ..................... 4
   C.   Sieverding's Accommodation Request in 2016 ............................... 6
   D.   Sieverding's Complaints in 2017 ................................................. 9
   E.   Sieverding's 2017 ICRC Complaint and Alleged Retaliation ............. 11
   F.   Sieverding's Indefinite Leave of Absence and Discharge in
        Late 2017 ................................................................................ 13

IV.  SUMMARY JUDGMENT STANDARDS ............................................... 15

V.   ANALYSIS ....................................................................................... 18
   A.   Failure to Accommodate Claims .................................................. 18
        1.   Applicable Standards ......................................................... 19
        2.   Discussion ........................................................................ 22
   B.   Harassment Claims ................................................................... 24
        1.   Applicable Standards ......................................................... 26
        2.   Discussion ........................................................................ 28
             a.   "Because of" Disability ............................................... 28
             b.   Severe or Pervasive .................................................. 32
   C.   Retaliation Claims .................................................................... 34
        1.   Applicable Standards ......................................................... 34
        2.   Discussion ........................................................................ 37

|  |  | a. | *Adverse Employment Actions* | 37 |
|  |  | b. | *Causation* | 39 |
|  | **D.** | **Interference with FMLA Rights Claim** | | 41 |
|  |  | **1.** | *Applicable Standards* | 41 |
|  |  | **2.** | *Discussion* | 43 |
|  | **E.** | **FMLA Retaliation Claim** | | 44 |
|  |  | **1.** | *Applicable Standards* | 45 |
|  |  | **2.** | *Discussion* | 46 |
| **VI.** | **CONCLUSION** | | | 48 |

## I. INTRODUCTION

This case is before me on a motion (Doc. No. 19) for summary judgment filed by defendant Humach, LLC. Plaintiff Susan Sieverding has filed a resistance (Doc. No. 31) and Humach has filed a reply (Doc. No. 37). I find that oral argument is not necessary. *See* Local Rule 7(c).

## II. PROCEDURAL HISTORY

Sieverding commenced this action on July 16, 2018, by filing a three-count complaint (Doc. No. 1) against Humach. Counts I and II assert failure to accommodate, harassment and retaliation in violation of the American with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the Iowa Civil Rights Act (ICRA), Iowa Code Chapter 216. Count III alleges interference with rights and retaliation in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et. seq.*

Before filing this action, Sieverding filed a complaint and an amended complaint with the Iowa Civil Rights Commission (ICRC) alleging that she was discriminated against on the basis of her disability, denied an accommodation, harassed and retaliated against. Doc. No. 19-2 at 133–36. The ICRC issued a Right-To-Sue Letter on April 18, 2018, advising Sieverding that she had 90 days to commence judicial proceedings. Doc. No. 31-3 at 20. She then filed her complaint in this court on July 16, 2018. Humach

filed its motion for summary judgment on November 15, 2019, seeking judgment in its favor on all counts.  A jury trial is scheduled to begin May 26, 2020.

## III.    RELEVANT FACTS

The following facts are undisputed unless otherwise noted.

### A.    Background

Humach provides contact center services for a variety of clients and industries. Doc. No. 31-1 at 1.  One client was Lifelock, an identity theft protection provider.  *Id.* Humach served Lifelock from a contact center located in Dubuque, Iowa.  *Id.*  The center had an open floor plan with rows of cubicles containing approximately 63 workstations. *Id.*  Each employee was assigned a primary workstation based on his or her shift start time and schedule, but all employees had the option to move to an unoccupied workstation on any given day.  *Id.* at 2.  Workstations 145 through 148 and 150 through 155 made up a training zone where newly hired employees were assigned until comfortable with all job tasks.  *Id.*

Humach hired Sieverding in December 2011 as a Member Relations Specialist on the Lifelock account.  *Id.*  Sieverding worked on the Lifelock account throughout her employment with Humach.  Doc. No. 35 at 1.   Sieverding's supervisor was Kim Hundrieser and the manager of the contact center was Nancy Prine.  *Id.* at 2. Sieverding's primary duties were to answer phone calls from clients, listen to customers, determine their needs, sell them services that satisfy their needs, and assist in the training and development of new agents through demonstrating, answering questions, observing and offering constructive feedback.  Doc. No. 31-1 at 3.  On July 10, 2015, Sieverding was promoted to Senior Member Relations Specialist.  *Id.* at 5; Doc. No. 35 at 1.  Her job duties remained largely the same, but she had to meet certain criteria to maintain the title. Doc. No. 31-1 at 5.

## B. *Sieverding's Intermittent FMLA Leave Begins in 2015*

In January 2015, after the death of her niece, Sieverding sought the services of a licensed mental health therapist, Dr. Lynne Lutze. *Id.* at 3; Doc. No. 35 at 1. Starting in February 2015, Sieverding took intermittent FMLA leave due to her grief. Doc. No. 31-1 at 3. She testified that the leave was suggested by Jenni Bauer, a Humach human resources employee, in response to her request to be taken off of retention calls. Doc. No. 35 at 3. Sieverding's FMLA Certification of Health Care Provider dated February 20, 2015 (2015 FMLA certification), states:

> Client is struggling with depression related to a recent trauma experience in January 2015. Client reported taking calls dealing with death and the recent loss of a family member has made it very difficult for her to perform her job without breaking down emotionally. She doesn't want to lose her job just have modifications to her calls or change positions if something opens up.

Doc. No. 31-3 at 3. Humach asserts the depression noted in the 2015 FMLA certification was related to the passing of Sieverding's niece a month before. Doc. No. 31-1 at 4. Sieverding disputes this and argues she was told by Bauer that she could take intermittent FMLA whenever she was too emotional to take calls. *Id.*; Doc. No. 35 at 4.

Sieverding renewed her intermittent FMLA leave in March 2016 and March 2017. Doc. No. 31-1 at 4. Humach argues she did so on the same basis as was provided in the 2015 FMLA certification. *Id.* Sieverding disputes this and argues her 2016 and 2017 FMLA certifications list a number of additional relevant medical facts that were not included in her 2015 FMLA certification. *Id.*; Doc. No. 35 at 4. The 2016 FMLA certification states:

> [Sieverding] continues to struggle with depression and overwhelming sadness. She has suffered some losses in her family which have magnified her symptoms. She is the main support system for her family which also causes heavy burden and stress. [She] often works with customers who have suffered trauma and loss which often triggers her own emotional trauma. [She] has a hard time keeping her composure when she is under tremendous sadness and grief.

Doc. No. 19-2 at 56. The 2017 FMLA certification states:

> [Sieverding] struggles with depression. She has multiple losses in her family system. Her grief magnifies the symptoms of her depression. [She] works in an industry where customers have suffered trauma and loss which triggers her emotionally. She has a hard time keeping her composure on the job. She has a difficult time with concentration and focus on details when emotionally [unintelligible].

*Id.* at 60.

Humach asserts that when Sieverding asked to take intermittent FMLA leave, it allowed her to do so. Doc. No. 31-1 at 4. Sieverding disputes this and argues she was not permitted to take FMLA leave on numerous occasions when she was experiencing emotional issues. *Id.* She argues that she was not allowed to use FMLA leave in July 2015. *Id.*; Doc. No. 35 at 5. On July 13, 2015, Sieverding emailed Bauer, asking "does my FMLA now cover for me to take off to help Heidi [Sieverding's sister]?" Doc. No. 35-1 at 4. Bauer replied, "FMLA does not cover care for a sibling." *Id.* Sieverding testified that she did not need time off to care for her sister but, instead, to grieve with her sister due to her niece passing and that she explained this to Bauer. Doc. No. 35 at 5–6. Humach argues the email speaks for itself and the FMLA did not cover Sieverding missing work to care for her sister. *Id.*

Sieverding also argues that she was not allowed to use her FMLA leave in August 2015. Doc. No. 31-1 at 5; Doc. No. 35 at 6. She testified that she requested leave and explained to Bauer she needed leave because her father was in the hospital and her sister was having a baby and these events brought back the sadness of losing her niece. Doc. No. 31-1 at 5; Doc. No. 35 at 6. Humach disputes this and asserts Sieverding requested leave in August 2015 due to her father's medical condition, which was not covered by her FMLA certification. Doc. No. 35 at 6.

Sieverding asserts there were many other occasions she was not allowed FMLA leave. Doc. No. 31-1 at 5; Doc. No. 35 at 6. She testified that if Hundrieser was not at work, then Jenn Puetsch (a Humach team lead employee), April Kruser (another Humach

supervisor), or Josh Boffeli (a Humach senior trainer), would mark Sieverding absent even though she had told them she was taking FMLA leave. Doc. No. 31-1 at 5; Doc. No. 35 at 4, 6–7. She also testified that Prine would call her at home to ask why she took FMLA leave. Doc. No. 31-1 at 5; Doc. No. 35 at 7. Sieverding testified Prine would then tell her that her FMLA leave would not be approved for that date. Doc. No. 31-1 at 5; Doc. No. 35 at 7. She further testified that during her last review, Hundrieser told her that Bauer and Prine would not approve two absences that Sieverding thought were clearly covered by the FMLA. Doc. No. 31-1 at 5; Doc. No. 35 at 7. For one of these absences, Sieverding testified she was at the hospital because of an elevated heart rate due to medication and emotional issues. Doc. No. 31-3 at 42. The record does not indicate the nature of the second absence.

Humach claims Sieverding was never denied FMLA leave when her request was within the bounds of her FMLA certification. Doc. No. 35 at 5, 7.

## C.     *Sieverding's Accommodation Request in 2016*

In March 2016, Sieverding was temporarily assigned to a workstation in the training zone along with several other agents. Doc. No. 31-1 at 6. Humach assigned skilled agents, such as Sieverding, to temporarily sit by newly hired agents in the training zone to assist with questions and share knowledge. *Id.* In April 2016, Sieverding complained to Prine about the training zone. *Id.* Prine told Sieverding that she could relocate to any unoccupied workstation at any time. *Id.* Humach alleges this included a quieter part of the contact center where there is very little traffic and is away from the breakroom, elevator, front entrance and restrooms. *Id.* Sieverding disputes that this part of the contact center was quiet and states it was extremely loud. *Id.*

In June 2016, Sieverding complained in an email to Hundrieser about her workstation assignment because she believed a female co-worker was being mean to her. *Id.* Hundrieser replied, "Be very clear and tell me what you want. I will accommodate you if I can." *Id.* Sieverding chose to sit at workstation 96, and was allowed to remain

at that workstation even when the seating chart was updated routinely for other employees. *Id.* at 7.

On July 7, 2016, Sieverding alleged that Hundrieser was not allowing her an accommodation for her condition of attention deficit hyperactivity disorder (ADHD). *Id.* The basis for this complaint was that a co-worker was allowed to use her workstation on Sieverding's days off and that another co-worker who speaks loudly was assigned a workstation near her.[1] *Id.* at 8. Prior to July 7, 2016, Sieverding had not provided any medical documentation supporting a need for an accommodation for ADHD.[2] *Id.* at 8. At this point, Humach requested Sieverding provide information from her physician stating the specific accommodation the physician felt would be beneficial for her. *Id.* However, because Sieverding was so upset, Humach reassigned the agent sharing Sieverding's workstation to another workstation and reminded Sieverding she could relocate to the training zone where it is quieter if she preferred an unoccupied workstation. *Id.* at 9.

Sieverding contends that ADHD makes it extremely difficult for her to focus and concentrate if there are noises and distractions in her work area. Doc. No. 35 at 8. Sieverding provided Humach a physician's note dated July 19, 2016, stating, "Please provide a quiet work environment for Susan due to her medical issues." Doc. No. 31-1 at 9. In response, Sieverding was informed, as she had been the week before, that she could move to a workstation in the training zone or to any other unoccupied workstation. *Id.* Sieverding did not want to relocate permanently from workstation 96, so she stated it was best to have the option to relocate on an as-needed basis. *Id.* Humach agreed to

---

[1] Due to space limitations in the contact center, the sharing of workstations was not uncommon. Doc. No. 31-1 at 8. Additionally, at times many employees were talking to customers simultaneously, as that was the primary function of their jobs. *Id.*

[2] Sieverding alleges that she never had to provide medical documentation regarding any accommodation before because her supervisors accommodated her without it. Doc. No. 35 at 8. Humach denies this. *Id.*

her request and reminded her it was up to her to determine when she needed to move to a quieter area and to advise her supervisor when she intended to do so. *Id.* at 9–10. From July 20, 2016, to April 28, 2017, Sieverding used a workstation in the training zone on only six days and otherwise remained at workstation 96. *Id.* at 10.

Nonetheless, Sieverding alleges that even after providing Humach with medical documentation, she was not permitted to sit in a quieter part of the contact center. Doc. No. 35 at 9. Sieverding testified that Boffeli moved her to a workstation next to his workstation and Hundrieser's workstation in the training zone. *Id.* at 10, 15. Sieverding testified Boffeli and Hundrieser listened to loud music and talked at their workstations. *Id.* at 10. Humach disputes that Sieverding was required to change workstations. *Id.*; Doc. No. 19-2 at 42–47.

Sieverding also asserts she was initially at a quiet workstation, but Humach moved extremely loud and noisy co-workers near her. Doc. No. 35 at 10–11. Sieverding testified that the same day she was allowed to pick her workstation and picked the workstation she always had, Puetsch allowed "a bunch of loud, noisy people come right next to her." *Id.* at 9. Humach disputes that Sieverding was not allowed to sit in a quieter area and alleges that Sieverding was allowed to move her workstation on an as-needed basis. *Id.* Sieverding further testified she emailed Carla Donar, Humach's director of human resources, about this problem, and Donar did nothing about it. *Id.* at 11. Humach denies this discussion occurred and points out that Sieverding has not provided the alleged email. *Id.* Sieverding also asserts she complained to Prine about noise and Prine told her that she had to sit in the training zone. *Id.* Humach denies this occurred as well. *Id.*

## D.    Sieverding's Complaints in 2017

On March 10, 2017, Sieverding sent an email to Bauer reporting noise from newer agents and complaining that she was not allowed to train and was not receiving awards.[3] *Id.* at 12; Doc. No. 35-1 at 10–11.  On April 7, 2017, she sent an email to Prine reporting that she had been able to do training only three times during the five years she worked at Humach.  Doc. No. 35 at 12; Doc. No. 31-3 at 7.  Prine replied that "[j]ust because someone is a [senior agent] does not mean we must use them for training.  I know we are trying several different agents so we have a larger pool to utilize (which I think I've explained before) as well."  Doc. No. 31-3 at 7.

On April 13, 2017, Sieverding sent an email to Prine and Bauer detailing several complaints.  Doc. No. 31-1 at 13; Doc. No. 35 at 13.  She reported that during the previous day, Boffeli yelled at her and removed her from training.  Doc. No. 19-2 at 130.  She wrote that Boffeli had been "threatening and verbally aggressive towards" her. *Id.*  She also wrote that "[l]ast summer . . . he literally pushed me away . . . [and] the floor witnessed him pushing me."  *Id.*  Sieverding also complained about a co-worker named Alan, who she thought was "bossing" her around and causing co-workers to talk "smack" about how he got to train but not her.  *Id.*

Humach denies that the pushing incident occurs and asserts that this email was the first time Sieverding reported it to the company.  Doc. No. 31-1 at 13.  Sieverding testified that co-workers saw it happen, including Candi Churchill, another Humach supervisor, and that she reported the incident on the day it happened.  *Id.*; Doc. No. 35 at 19.  She also testified she told Bauer about the altercation multiple times and also told

---

[3] Sieverding violated Local Rule 56(b) because this alleged fact in her Statement of Additional Material Facts (Doc. No. 35), along with some other alleged facts, are not "supported by references to those specific pages, paragraphs, or part of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the statement, with citations to the appendix containing that part of the record."  This makes it very difficult for the court to address the issues in an efficient manner.

Prine, who responded by accusing her of lying about it.[4] Doc. No. 31-1 at 13; Doc. No. 35 at 20–21.

On April 14, 2017, Donar met with Sieverding to discuss her complaints. Doc. No. 31-1 at 14. During that meeting, Sieverding stated that two days prior Boffeli yelled at her while stating that Sieverding would not assist in the training zone in the future due to her unprofessional behavior during a client visit that week. *Id.* Donar told Sieverding that she had just spoken to Kruser, who was present during Sieverding's conversation with Boffeli, and Kruser stated that Boffeli did not yell and that Kruser agreed with Boffeli's decision because of Sieverding's behavior. *Id.* at 15. Sieverding made various other complaints during this meeting, such as never being chosen to assist with training. *Id.* However, after Donar looked into it, she found Sieverding was chosen to assist with training on 27 of the 42 weekdays she was present from January to April 2017. *Id.* Humach alleges Donar also asked Sieverding at their meeting why she did not report earlier that Boffeli had pushed her in summer of 2016 and Sieverding replied that she did not want to get Boffeli in trouble. *Id.* Sieverding denies she said this and alleges she told Donar that she had reported that Boffeli hit her but nothing was done about it. *Id.* Donar told Sieverding she would look into her allegation against Boffeli and get back to her. *Id.*

During the week of April 17, 2017, Donar and Bauer met with Churchill regarding Sieverding's allegation that Churchill saw Boffeli push her. *Id.* at 16. Churchill denied that it occurred. *Id.* Donar and Bauer met with Sieverding on April 27, 2017, to discuss the outcome of their conversation with Churchill. *Id.* at 19.

---

[4] Sieverding testified that Boffeli was physical with her on two other occasions. Doc. No. 35 at 18. Sieverding alleges the second physical encounter occurred in September 2016. *Id.* at 22. Sieverding testified that Boffeli decided to change a lightbulb above her desk while she was on a phone call and pushed her during the process. *Id.* She testified that Hundrieser witnessed the situation. *Id.* at 23. Humach denies that this ever occurred and denies that Sieverding ever reported it. *Id.* There is no information in the record about the third alleged incident of physical contact.

### E. Sieverding's 2017 ICRC Complaint and Alleged Retaliation

On April 18, 2017, Sieverding filed a complaint with the Dubuque Human Rights Commission that was later transferred to the ICRC. *Id.* at 17. Humach was not notified of the complaint until Donar received it on April 26, 2017. *Id.* Sieverding alleged that Boffeli became aware of her accommodation in November 2015 and harassed her because of that accommodation by moving her workstation to a noisier part of the contact center, not allowing her to train, commenting about her accommodations in front of others and referring to her on one occasion as "special." Doc. No. 31-1 at 17; Doc. No. 35 at 14. Humach alleges that prior to filing her complaint, Sieverding had never reported to a Humach supervisor, manager or human resources employee that Boffeli commented about Sieverding's accommodation or referred to her as special in front of others. Doc. No. 31-1 at 17–18. Sieverding disputes this and claims she reported comments made by Boffeli about her accommodations to Prine and Bauer on multiple occasions before filing her complaint. *Id.* at 18. She admits she never reported that Boffeli called her special because it happened right before she filed her complaint. *Id.* Sieverding did not allege in her ICRC complaint that Boffeli pushed her or otherwise physically touched her. *Id.* at 17.

Sieverding testified that after she filed her initial ICRC complaint, the noise in the call center got worse. Doc. No. 35 at 14. She testified that Humach, and specifically Boffeli, moved quiet co-workers away from her and noisy co-workers near her on purpose.[5] *Id.* at 14, 16. In her affidavit she states co-workers would play their radios

---

[5] Sieverding filed affidavits from Victoria Bennett and Melissa Neal, former Humach employees. Doc. No. 35 at 27, 29. Bennett's affidavit describes events that occurred between the fall of 2015 to May and June 2016, when her employment with Humach ended. *Id.* at 27. Bennett states that she witnessed discrimination against Sieverding because her workstation was next to Sieverding's even though Bennett is loud. *Id.* at 28; Doc. No. 31-3 at 84. She states that she did not witness bullying against Sieverding, but she did overhear co-workers talk about bullying her. Doc. No. 35 at 28; Doc. No. 31-3 at 85. Neal's affidavit describes events that occurred

very loud and talk about how much she "hated" it. *Id.* at 17. She testified that on one occasion Kruser refused to turn off her radio and instead turned it up. *Id.* at 15. She also states in her affidavit that co-workers would talk about how unfair it was for Sieverding to be able to pick her workstation even though no one else could. *Id.* at 17. She further states her co-workers would watch her "like she was going to do something really terrible and discuss how they can't do this or that because of her." *Id.* at 17–18. She also states in her affidavit that her "supervisors told other employees that she was not able to do things," which resulted in co-workers not talking to her and making comments about what she cannot do. *Id.* at 18. Humach disputes that this alleged conduct occurred. *Id.* at 18.

On June 21, 2017, Sieverding sent an email to Prine complaining that Boffeli had removed her from training. Doc. No. 31-1 at 20; Doc. No. 35 at 24. Prine responded, "you haven't been removed from anything, so again I'm not sure what you are referring to." Doc. No. 35 at 24. On July 26, 2017, Sieverding filed an amended complaint with the ICRC, alleging she was retaliated against for filing her complaint. Doc. No. 31-1 at 19. Specifically, Sieverding alleged she was subjected to loud noise, removed from training duties and monitored. *Id.* The amended complaint made no reference to any alleged physical contact by Boffeli. *Id.*

Sieverding continued to complain to management on multiple occasions about the noise level near her workstation, including in emails sent on July 29 and August 10, 2017. *Id.* at 20; Doc. No. 35 at 24–26. Prine responded to the August 10 email, writing that Sieverding could move to another workstation and "a new seating chart is done every month or so and we do the best we can to sit tenured agents by new agents, this benefits

---

between the fall of 2015 and June 2017, when her employment with Humach ended. Doc. No. 35 at 29. Neel states that she witnessed discrimination against Sieverding because she was repeatedly seated around loud co-workers. *Id.*; Doc. No. 31-3 at 86. She also states she "heard many people in management talk badly about [Sieverding] and purposely ignore her or punish her for asking them to do the right thing." Doc. No. 35 at 30; Doc. No. 31-3 at 86–87.

the new agents and increased performance which is our utmost priority." Doc. No. 35 at 25. Prine also noted in her email Humach allowed Sieverding to keep her seat even when a new seating chart was created. *Id.* The contact center was also reminded on multiple occasions during this time period to be mindful of the noise level. Doc. No. 31-1 at 20.

**F.      *Sieverding's Indefinite Leave of Absence and Discharge in Late 2017***

Sieverding began an extended period of FMLA leave on September 29, 2017. *Id.* at 21. On October 5, 2017, Sieverding emailed Prine, asking if Humach would provide her with unemployment benefits "since [Prine] is the one that suggested I take a leave of absence." Doc. No. 35-1 at 18. Prine forwarded the email to Bauer and Bauer responded that although Humach did not make unemployment benefit determinations, it was her understanding that Sieverding would not be eligible for benefits. *Id.* at 16. Sieverding replied, complaining about the noise level at her workstation, Boffeli's behavior and the "extreme bullying" she experienced at Humach. *Id.* at 15–16; Doc. No. 35 at 26. Sieverding also wrote that she believed she could get unemployment benefits and that Prine specifically asked her to take a leave of absence. Doc. No. 35-1 at 15. Bauer replied that Sieverding was simply offered a leave of absence and that Sieverding was allowed to choose her workstation and relocate at any time. *Id.* at 14–15.

On October 12, 2017, Sieverding sent an email to Bauer and Prine requesting worker's compensation because of emotional stress that Humach allegedly caused her. Doc. No. 35 at 27; Doc. No. 31-1 at 21. Sieverding stated she had been "unfairly treated, bullied, punished, slandered, hit and discriminated against to the point that I a[m] unable to be at work." Doc. No. 19-2 at 165. She also stated her accommodation had been completely removed since April 2017. *Id.* Donar replied that she would initiate a first report of injury. *Id.*

On October 26, 2017, Sieverding provided a letter to Humach from Dr. Lutze which stated Sieverding was "recommended to take a leave of absence due to personal

and work related matters that are affecting her ability to perform her job duties." Doc. No. 31-1 at 21; Doc. No. 35 at 30. On November 2, 2017, Bauer emailed Sieverding requesting an anticipated return-to-work date. Doc. No. 31-1 at 22. Sieverding's FMLA leave exhausted on November 11, 2017. *Id.* On November 16, 2017, Bauer provided Sieverding a letter informing her that she did not receive a response to her November 2 email and requested Sieverding provide a return-to-work date by November 27. *Id.* In response, Humach received doctor notes dated December 5 and 8, 2017, recommending Sieverding "not return to work until further notice." *Id.* The December 5, 2017, note from Dr. Lutze further stated:

> It is my professional opinion that the inordinate work stressors of removal of accommodations, failure to provide medical care in diabetic events, and harassment and hostile work environment are the cause of Susan Sieverding's aggravated condition on her mental health. I have further recommended Susan Sieverding seek medication treatment for induced panic attacks cause by Humach's conduct with my patient. I am recommending that my patient Susan Sieverding not return to work until further notice.

Doc. No. 19-2 at 175.

Sieverding alleges she spoke with Donar after the December 5, 2017, note and Donar told her not to come back to work and that she would be receiving workers' compensation benefits. Doc. No. 35 at 32. Humach denies this conversation occurred.[6] *Id.* On December 12, 2017, Humach terminated Sieverding's employment. Doc. No. 31-1 at 22; Doc. No. 35 at 32. Humach asserts it did so because she had exhausted her FMLA leave and the duration of her continued leave was indefinite. Doc. No. 31-1 at 22. Sieverding disputes this was the reason her employment was terminated. *Id.*

---

[6] Sieverding also alleges that the last time she spoke to Prine, Prine told her that if she did not want to be at work, then she should not return. Doc. No. 35 at 31. The record is not clear about when this occurred, but Sieverding testified that it happened in the conference room, so it appears to have taken place before she began to take extended FMLA leave on September 29, 2017. Humach denies that Prine ever told Sieverding she should not return. *Id.*

## IV.    SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, "the substantive law will identify which facts are material."  *Id.*  Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not.  *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question."  *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).  Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial."  *Anderson*, 477 U.S. at 248–49.  The party moving for entry of summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue."  *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323).  Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing

that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1377 (8th Cir. 1996).

No unique summary judgment standards apply to employment discrimination cases. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042–43 (8th Cir. 2011) (en banc) (rejecting prior decisions that applied a "discrimination case exception" to the analysis of summary judgment motions). However, as another judge of this court explained, applying summary judgment standards to the motivation-intensive elements present in most employment discrimination cases is not a simple task:

> Employment discrimination and retaliation, except in the rarest cases, are difficult to prove. They are perhaps more difficult to prove today—fifty years after the passage of the EPA, more than forty years after the passage of Title VII and the ADEA, more than twenty years after the passage of the ADA, and nearly two decades after the passage of the FMLA—than during the earlier evolution of these anti-discrimination and anti-retaliation statutes. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697–98 (7th Cir. 1987). Indeed, the Fifth

Circuit Court of Appeals recognized more than thirty-five years ago, that "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees." *Rogers v. EEOC*, 454 F.2d 234, 239 (5th Cir. 1971) (later relied on by the Supreme Court in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–67 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII).

My experience suggests the truth of that observation. Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination and retaliation cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination and retaliation plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination or retaliation are proportional to the caliber of the employee, discrimination or retaliation against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination and retaliation plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the ADA, the ADEA, the EPA, or the FMLA—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.* On the other hand, it is also relatively easy for disgruntled former employees to claim a protected basis under federal and state anti-discrimination laws as a reason for their discharge when in fact they played no part. This is true even when the former employee and/or their counsel believe they did. This is what makes deciding these issues on a paper record daunting.

*Pick v. City of Remsen*, No. CV13-4041, 2014 WL 4258738, at *12 (N.D. Iowa Aug. 27, 2014). While the task can indeed be daunting in an employment discrimination case, "the focus of inquiry at the summary judgment stage 'always remains on the ultimate question of law: whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the plaintiff because of [the protected characteristic].'" *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1018 (8th Cir. 2005) (quoting *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1336–37 (8th Cir. 1996)).

## V.     ANALYSIS

As noted above, Sieverding's three-count complaint asserts five distinct claims: (1) failure to accommodate in violation of the ADA and the ICRA, (2) harassment in violation of the ADA and the ICRA, (3) retaliation in violation of the ADA and the ICRA, (4) interference with FMLA rights and (5) discharge in retaliation for exercising FMLA rights. I will address each claim separately.

### A.     *Failure to Accommodate Claims*

Humach argues it is entitled to summary judgment on Sieverding's failure to accommodate claims because it reasonably accommodated her ADHD by offering her a quieter workspace. Doc. No. 21 at 11. Humach contends that once it received documentation of Sieverding's disability and her need for a quiet work environment (and even before then), it informed her that she could move to a workstation in a quieter area of the contact center. *Id.* Humach claims it repeatedly reminded Sieverding that she could move to any unoccupied workstation if her assigned workstation was too loud. *Id.* Humach states that this may not have been Sieverding's preferred accommodation, but it was a reasonable one. *Id.* at 12.

Humach also argues that Sieverding was not entitled to an indefinite leave of absence after she exhausted her FMLA leave on November 11, 2017, because indefinite leave is not a reasonable accommodation. *Id.* Humach notes that it did accommodate Sieverding by allowing her to remain on leave for approximately one month after her FMLA leave expired. *Id.* However, Humach argues Sieverding did not provide a return-to-work date. *Id.* Humach also argues that Sieverding's refusal to inform it of when she could be expected to return to work demonstrates her failure to participate in the interactive process. *Id.* at 13.

Sieverding acknowledges she was offered an accommodation allowing her to move to an unoccupied workstation on an as-needed basis if it was too loud at her assigned

workstation. Doc. No. 31-1 at 9–10. However, she contends she complained after the accommodation was offered that she was not being provided with a quiet work environment, and therefore the company had an obligation to continue the interactive process and ensure that the accommodation was actually being provided. *Id.* at 9. She argues she sent multiple emails to Humach management complaining that she was not being accommodated, that the training area was not a quiet area and that Boffeli and others continued to move loud co-workers into her work area. *Id.*

Sieverding also argues she attempted to engage in the interactive process when Dr. Lutze sent her December 5, 2017, letter to Humach, which explained that Sieverding could not return to work because of harassment and the removal of her accommodation. *Id.* at 10. Sieverding contends the letter, while not explicitly so stating, invited further discussion on how she could have been accommodated and the harassment alleviated. *Id.*

### 1. *Applicable Standards*

Sieverding alleges disability discrimination for failure to accommodate under both the ADA and ICRA. When the parties "do not dispute the application of federal analysis, disability claims under the ICRA are generally analyzed in accord with the ADA." *Gretillat v. Care Initiatives*, 481 F.3d 649, 652 (8th Cir. 2007) (citing *McElroy v. State*, 703 N.W.2d 385, 391 (Iowa 2005)); *see also Kallail v. Alliant Energy Corporate Services, Inc.*, 691 F.3d 925, 930 (8th Cir. 2012) ("'[D]isability claims under the ICRA are generally analyzed in accord with the ADA.'" (quoting *Gretillat*, 481 F.3d at 652)). Because the parties do not argue otherwise, I will analyze both Sieverding's ADA and ICRA disability discrimination claims under the federal framework.

Under the ADA, employers are prohibited from discriminating against "a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see also Gretillat*, 481 F.3d at 652. The ADA further prohibits employers from:

not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity. . . .

42 U.S.C. § 12112(b)(5)(A). In a failure to accommodate case, "the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations." *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004). The Eighth Circuit Court of Appeals has explained:

> it is not the employer's discriminatory intent in taking adverse employment action against a disabled individual that matters. Rather, discrimination occurs when the employer fails to abide by a legally imposed duty. The known disability triggers the duty to reasonably accommodate and, if the employer fails to fulfill that duty, we do not care if he was motivated by the disability.

*Id.* (citations omitted). Thus, "an employer is required to provide reasonable accommodations to the known physical or mental limitations of an otherwise qualified employee with a disability, unless the requisite accommodation would impose an undue hardship on the employer's business." *Battle v. United Parcel Service, Inc.*, 438 F.3d 856, 862 (8th Cir. 2006) (citing 42 U.S.C. § 12112(b)(5)(A)).

In reasonable accommodation cases, courts apply a modified burden-shifting analysis. *Fenney v. Dakota, Minnesota & Eastern Railroad Co.*, 327 F.3d 707, 712 (8th Cir. 2003). Under that approach:

> [T]he employee "must first make a facial showing that he has an ADA disability and that he has suffered an adverse employment action. Then he must make a facial showing that he is a 'qualified individual.'" "To be a 'qualified individual' within the meaning of the ADA, an employee must '(1) possess the requisite skill, education, experience, and training for his position, and (2) be able to perform the essential job functions, with or without reasonable accommodation.'" In cases where the employee claims that he is able to perform the essential functions of the job with reasonable accommodation, the employee "must only make a 'facial showing that a reasonable accommodation is possible.'" When the employee has made

that facial showing "the burden then shifts to the employer to show that it is unable to accommodate the employee."

*Brannon v. Luco Mop Co.*, 521 F.3d 843, 848 (8th Cir. 2008) (quotations and citations omitted). "If the employer can show that the employee cannot perform the essential functions of the job even with reasonable accommodation, then the employee must rebut that showing with evidence of his individual capabilities." *Fenney*, 327 F.3d at 712 (quotation omitted). "At that point, the employee's burden merges with his ultimate burden of persuading the trier of fact that he has suffered unlawful discrimination." *Id.* (quotation omitted).

Further, "[w]here the employee requests accommodation, the employer must engage in an 'informal, interactive process' with the employee to identify the limitations caused by the disability and the potential reasonable accommodations to overcome those limitations." *Battle*, 438 F.3d at 862 (citing *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 951 (8th Cir. 1999)). At the summary judgment stage, the Eighth Circuit has stated "the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith." *Cravens v. Blue Cross and Blue Shield of Kansas City*, 214 F.3d 1011, 1021 (8th Cir. 2000) (quotation omitted). In order to show that an employer failed to participate in the interactive process, the plaintiff must show:

> 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*E.E.O.C. v. Product Fabricators, Inc.*, 763 F.3d 963, 971 (8th Cir. 2014) (quoting *Peyton v. Fred's Stores of Ark. Inc.*, 561 F.3d 900, 902 (8th Cir. 2009)). If a court concludes that the employer failed to engage in the interactive process, then "a factual question exists as to whether the employer has attempted to provide reasonable accommodation as required by the ADA." *Cravens*, 214 F.3d at 1021 (quoting

*Fjellestad*, 188 F.3d at 952). However, "if no reasonable accommodation is available, an employer is not liable for failing to engage in a good-faith interactive process." *Battle*, 438 F.3d at 864 (citation omitted).

## 2. *Discussion*

The parties' arguments address only whether they engaged in an interactive process to identify and provide a reasonable accommodation for Sieverding's need for a quiet work environment. Humach assumes for purposes of its motion that Sieverding's ADHD constitutes a disability under the ADA and ICRA. Further, Humach does not dispute that Sieverding has made a facial showing that she suffered an adverse employment action and was a qualified individual. Neither does Humach argue that it was unable to accommodate Sieverding. To the contrary, Humach argues that it provided a reasonable accommodation. The issue is whether the parties continued to engage in the interactive process after the accommodation was offered and Sieverding continued to complain about noise.

Sieverding has created a genuine issue of material fact as to whether Humach participated in the interactive process. Humach knew about Sieverding's disability and received a note from her physician stating that she needed a quiet work environment. Sieverding requested an accommodation from Humach. She testified that her workstation was initially in a quiet area of the contact center, but due to seating chart changes it became loud. Doc. No. 35 at 10. Sieverding agrees that Humach offered her the option to move to any unoccupied workstation when there was too much noise at her assigned workstation. However, Sieverding's sworn testimony is that other areas of the contact center where she could have sat were not quiet. Doc. No. 31-1 at 6; Doc. No. 35 at 10. She also testified that while her assigned workstation was initially in a quiet area, the seating chart changed and loud co-workers were seated near her workstation. Doc. No.

35 at 10.  Sieverding further testified that she had to move to different workstations that were in loud areas of the contact center.[7]  *Id.*

Viewing the evidence in a light most favorable to Sieverding, there is a genuine dispute as to whether Humach "made a good faith effort to engage in the interactive process, and [] a reasonable jury could conclude that [Humach] has not met its burden to engage in an interactive process to determine whether an appropriate reasonable accommodation existed." *Fjellestad*, 188 F.3d at 952.  The record contains evidence of multiple instances when Sieverding complained to supervisors and management that she had not been provided a quiet work environment.  She states that she complained to management that her assigned workstation was not quiet and any other workstation she could have picked had the same issue.  Doc. No. 31-3 at 79.  She also states she asked management if an arrangement could be made to designate an area in the contact center as a quiet area.  *Id.*  While she was told in response to her complaints that she could choose any unoccupied workstation, Sieverding continued to complain that she was not being accommodated.

Reasonable jurors considering Sieverding's testimony could find that Humach did not make a good faith effort to assist her in identifying an accommodation because the offered accommodation was not reasonable and Humach did not offer other options despite Sieverding's complaints.  Reasonable jurors could also find that Humach did not act in good faith because Humach did not always honor the offered accommodation.  Sieverding has presented evidence showing that she was required on a number of occasions to sit at certain workstations that were not quiet.

I agree with Humach that there is no genuine issue of material fact as to whether Humach failed to accommodate Sieverding when it terminated her employment on

---

[7] While there is no dispute that Sieverding sat at her assigned workstation for all but six days from July 20, 2016 to April 18, 2017 (Doc. No. 31-1 at 10), this does not contradict Sieverding's deposition testimony that she had to change seats on a few occasions because Sieverding continued to work at Humach for several months after April 2017.

December 12, 2017. Sieverding exhausted her FMLA leave on November 11, 2017, and continued to remain on leave. An employer is not required to accommodate an employee by allowing an indefinite and unlimited leave of absence. *Brannon*, 521 F.3d at 849. Humach requested on numerous occasions that Sieverding provide a return-to-work date, but she did not do so.

Nor did Sieverding attempt to engage in the interactive process to identify an accommodation that would allow her to return to work when Dr. Lutze sent her December 5, 2017, letter to Humach. While the letter states that "removal of accommodations" is one reason for Sieverding's mental health conditions, it also states she will "not return to work until further notice." Doc. No. 19-2 at 175. The letter did not suggest that Humach should act to provide accommodations for when Sieverding returned to work. Just the opposing, the letter stated that Sieverding would not return to work until further notice.

To conclude, Humach is not entitled to summary judgment on Sieverding's claims under the ADA and ICRA that it failed to accommodate her with a quiet work environment. However, to the extent Sieverding claims she should have been accommodated with an indefinite leave of absence after she exhausted her FMLA leave, the summary judgment motion will be granted.

**B.     *Harassment Claims***

Humach argues it is entitled to summary judgment on Sieverding's harassment claims under the ADA and ICRA because the conduct Sieverding complains of does not constitute harassment. Doc. No. 21 at 15. Humach contends that the alleged conduct consists of perceived social slights from her co-workers, her belief that others were deliberately loud near her workstation, her belief that management purposefully placed loud co-workers near her workstation and an alleged lack of training opportunities. *Id.* at 17–18. Humach argues these allegations, even if accepted as true, do not rise to the level of actionable harassment. *Id.* at 19. Humach also claims that many of Sieverding's complaints, including her complaints that management purposefully moved loud co-

workers near her and co-workers were purposely loud near her, are based on only Sieverding's own speculation and self-serving characterization. Doc. No. 37 at 4. Humach further contends that Boffeli's alleged use of the word "special" to refer to Sieverding, and the occasional teasing or offhand comment, are insufficient to establish a hostile work environment. Doc. No. 21 at 18.

Humach also argues that Sieverding failed to exhaust administrative remedies for her allegations of physical contact by Boffeli because she did not include such allegations in her initial or amended ICRC complaint. *Id.* at 16. Moreover, according to Humach, even if Sieverding would have exhausted her administrative remedies as to this issue, these alleged instances of physical contact do not demonstrate that the workplace at Humach was so permeated with harassing conduct to alter the terms and conditions of her employment. *Id.*

Humach further argues it is entitled to summary judgment because Sieverding cannot establish that the alleged conduct she experienced occurred due to her disability, as the vast majority of that conduct was not related to her disability. *Id.* at 20. Humach argues that Sieverding's only evidence touching on her alleged disability is the allegation that Boffeli referred to her as "special" and made comments about her accommodation. *Id.* Humach argues that the term "special" does not constitute disability-specific language and the fact that Boffeli merely made neutral comments about her accommodation does nothing more than demonstrate that Boffeli was aware of it. *Id.* at 21.

Finally, Humach argues that its response to Sieverding's complaints of harassment was entirely appropriate. *Id.* Humach argues that after April 13, 2017, when Sieverding first informed management about Boffeli's alleged, improper behavior, Humach promptly investigated Sieverding's allegations and determined they were unfounded. *Id.* at 22. Humach argues that when it received complaints from Sieverding that co-workers were too loud, it provided her with the option of moving to a different workstation and periodically reminded employees to monitor their noise levels. *Id.*

Sieverding responds that there are genuine issues of material fact regarding her harassment claim. Doc. No. 31 at 11. First, she argues that because she alleged harassment in her ICRC complaint, she properly exhausted her administrative remedies as to her allegation that Boffeli physically touched her on three occasions. *Id.* Second, she argues the conduct she complains of constitutes severe and pervasive harassment when viewed as a whole. *Id.* at 12. Sieverding argues that the alleged harassment included: (1) management continually moving loud co-workers near her workstation on purpose, (2) management moving her to workstations in areas management knew were loud, (3) Boffeli shouting at her in a conference room, (4) being removed from training duties, (5) disrupting her phone calls, (6) Boffeli commenting about her accommodation, (7) Boffeli referring to her as "special," (8) co-workers deliberately listening to their radios loudly around her, (9) Boffeli striking her on three occasions, (10) co-workers discussing how unfair it was that she got to choose her own workstation, (11) co-workers watching her to see if she did anything wrong so they could report her for it and (12) Prine calling her a liar. *Id.* at 14.

Last, Sieverding argues that the alleged harassment was based on her disability because the majority of the conduct she complained about was noise-related, and her ADHD makes it extremely difficult to concentrate and function when noise distractions are present. *Id.* at 15. She argues that other alleged conduct was due to her disability because she was the only target. *Id.* at 15–16. She also argues that management failed to respond to numerous complaints she made about her work environment. *Id.* at 17.

## 1.    *Applicable Standards*

Employees who are subjected to a hostile work environment[8] may bring such a claim pursuant to the ADA. *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 719 (8th Cir. 2003). To be entitled to relief, Sieverding must show the following: (1) she is disabled,

---

[8] I use the terms "harassment" and "hostile work environment" interchangeably.

(2) she was subjected to unwelcome harassment, (3) the harassment resulted from her disabled status and (4) the harassment was severe enough to affect the terms, conditions or privileges of her employment. *Id.* at 720; *see also Farmland Foods, Inc. v. Dubuque Human Rights Com'n*, 672 N.W.2d 733, 744 (Iowa 2003).

The Eighth Circuit Court of Appeals has described the harassment standard as "demanding." *Arraleh v. County of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (quoting *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005)).

> A hostile work environment exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive working environment. Relevant factors for determining whether conduct rises to the level of harassment include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance.

*Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1018 (8th Cir. 2011) (internal quotations and citations omitted).

"To survive summary judgment, a plaintiff must present evidence from which a reasonable jury could conclude that the harassment was sufficiently 'severe or pervasive' to affect a term, condition, or privilege of the plaintiff's employment." *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1077 (8th Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). It is not the purpose of the harassment statutes "to smooth the rough edges of our daily discourse, nor to provide a federal cause of action for every slight." *Id.* The Court has "repeatedly emphasized that anti-discrimination laws do not create a general civility code." *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 779 (8th Cir. 2012) (quoting *Shaver*, 350 F.3d at 721).

## 2. Discussion

The parties do not dispute that Sieverding's ADHD constitute a disability under the ADA and the ICRA. Nor do they dispute that the conduct Sieverding alleges she experienced was unwelcome. Their arguments focus on whether Sieverding can show the other two elements of the prima facie case: (1) whether the alleged harassment was because of Sieverding's disability, and (2) whether the alleged harassment was severe or pervasive enough to affect the terms, conditions or privileges of her employment.

### a. "Because of" Disability

Sieverding has not shown that the conduct she complains of was because of her ADHD. "All instances of harassment need not be stamped with signs of overt discrimination to be relevant under [the ADA and ICRA]," but they must be "part of a course of conduct which is tied to evidence of discriminatory animus." *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir. 1999); *see also Canady v. John Morrell & Co.*, 247 F. Supp. 2d 1107, 1117 (N.D. Iowa 2003). However, Sieverding fails to present evidence of discriminatory animus.

Viewing the facts in a light most favorable to Sieverding, there is no evidence, besides her own speculation, that Humach management purposefully put loud co-workers near her or that co-workers were purposefully loud near her. *See Bank v. Deere*, 829 F.3d 661, 666 (8th Cir. 2016) ("Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." (quoting *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007)). Sieverding appears to argue that because management knew she had ADHD and needed a quiet work environment, and she did not receive a quiet work environment, then management purposefully sat noisy co-workers near her. However, just because Sieverding complained about noise and her complaints were not adequately addressed

does not show that management purposefully put co-workers near her because of her disability.[9]

Further, Sieverding's argument is undercut by the fact that she alleges management knew of her ADHD and accommodated her even before the summer of 2016. Doc. No. 31-1 at 8. She also specifically alleges Boffeli became aware of her need for an accommodation in November 2015. Doc. No. 35 at 14. However, the record shows that she complained about noise-related issues during the summer of 2016 and began to make frequent complaints in 2017. This demonstrates a lack of any discriminatory animus. Management and Boffeli knew of her disability long before they allegedly began to purposefully place loud co-workers near Sieverding. There is no temporal proximity between management learning of Sieverding's disability and their alleged behavior. This also supports the conclusion that Boffeli's other alleged conduct was not because of Sieverding's disability. Boffeli learned about Sieverding's accommodation in November 2015, but the two instances Sieverding described when he allegedly hit her occurred in the summer and fall of 2016. *Id.* at 19, 22. The incident in which Boffeli allegedly yelled at her happened in 2017. *Id.* at 13.

There is also no evidence co-workers were purposefully loud near Sieverding because of her disability. In fact, there is no evidence in the record that any co-workers knew Sieverding had a disability. The only fact that could possibly indicate they knew Sieverding had a disability is that Boffeli allegedly made comments about her accommodation in front of co-workers. *Id.* at 14. However, Sieverding does not explain what Boffeli said about her accommodation or to whom he said it. Comments about Sieverding's accommodation, an assigned workstation, do not indicate co-workers were made aware of Sieverding's disability. Further, even if co-workers learned about

---

[9] The affidavits Sieverding presents from two former co-workers do not help her. The fact that co-workers thought they should not have been placed next to Sieverding because they were loud does not demonstrate management purposefully put them next to her because they were loud. Doc. No. 31-3 at 84–87.

Sieverding's ADHD, there is no evidence that they were purposefully loud near Sieverding because of her disability.

For the same reasons, Sieverding has not created a triable issue of fact on whether the allegations that co-workers discussed how unfair it was that she got to choose her own desk or that co-workers watched her to report her for any wrongdoing were because of Sieverding's disability. Humach provided Sieverding with a permanent workstation, while co-workers rotated workstations periodically. Co-workers were bound to notice Sieverding did not switch seats when they did. This does not demonstrate that they knew Sieverding had a disability, nor does it demonstrate their actions and comments were tied to discriminatory animus.

The only evidence that comes close to showing discriminatory animus is that Boffeli allegedly referred to Sieverding as "special" on one occasion and made comments about her accommodation. Doc. No. 31-1 at 18. However, the term "special" is not disability-specific and Sieverding presents no evidence about the circumstances surrounding the use of the term that would indicate it was used with discriminatory animus. *See Kriss v. Sprint Communications Co.*, 58 F.3d 1276, 1281 (8th Cir. 1995) (The term "bitch" is not an indication of a general misogynist attitude and but instead "a crude, gender-specific vulgarity."). Sieverding has not come close to demonstrating that the use of the word "special" was even a crude, disability-specific vulgarity. Further, the fact that Boffeli made comments about Sieverding's accommodation, without evidence about what the specific nature or context of those comments, demonstrates only that Boffeli was aware about Sieverding's accommodation—not that his conduct was tied to discriminatory animus. All of Sieverding's other allegations, including that she was removed from training duties, are not tied to evidence of discriminatory animus.

Sieverding attempts to argue that the alleged harassment she experienced was based upon her disability because the majority of the conduct she complains about was noise-related, and her ADHD makes it extremely difficult to concentrate and function when noise distractions are present. This argument is unavailing. As discussed above,

Sieverding has shown no evidence of discriminatory animus. To make out a prima facie case of harassment, Sieverding must demonstrate that the harassment was *because of* her disability. Sieverding cites to no law in support of her argument that conduct is because of her disability because she complained about it to management and it affected her more than it would nondisabled co-workers. There is nothing in the record showing that any Humach employee acted with discriminatory animus at the time of any complained-of conduct.

Sieverding's argument that the alleged conduct was because of her disability since she was treated differently than other nondisabled co-workers is also of no help to her. If a plaintiff can show that disabled employees are the "primary targets" of harassment, then there is a sufficient showing that the harassment was based on the plaintiff's disability. *See Quick*, 90 F.3d at 1378. However, Sieverding put forth no evidence showing that nondisabled employees were treated differently than her.[10] She merely concludes she "was not treated the same as other non-disabled employees." Doc. No. 31 at 16; *see also Canady v. Wal-Mart Stores, Inc.*, 440 F.3d 1031, 1034 (8th Cir. 2006) (plaintiff's "belief that he was treated differently than similarly situated Caucasian employees," without any other "evidence that Wal–Mart treated other insubordinate employees differently," was insufficient to raise an inference of discrimination). There is no evidence, for example, that nondisabled employees were not subject to loud noise in the contact center, not allowed to train new employees or did not have their phone calls monitored and disrupted. The only evidence Sieverding presents is that she was subject to the alleged conduct and complained about it. Sieverding has wholly failed to show that the she was the "primary target" of the alleged conduct.

---

[10] The two affidavits from Sieverding's former co-workers assert that they were not allowed to use FMLA leave (Doc. No. 31-3 at 84–87), but this does nothing to demonstrate that nondisabled co-workers were treated differently. Nor does it demonstrate disabled co-workers were subject to Sieverding's allegations of harassment.

### b.     Severe or Pervasive

Sieverding also has not presented evidence from which a reasonable jury could conclude that the alleged was sufficiently severe or pervasive to affect a term, condition or privilege of her employment. Sieverding argues that the "most severe and pervasive harassment was the fact that management and co-workers made [Sieverding's] work environment unbearable for her by constantly and intentionally making her work environment loud simply because they knew it bothered her, they knew she complained about it constantly, and they knew management and HR was not going to do anything about it." Doc. No. 31 at 14. However, as I have discussed above, there is no evidence in the record that management and co-workers intentionally made her work environment loud because they knew it bothered her, knew she complained and knew nothing would be done. Instead, the evidence is that her work environment was loud and she complained about it. This does not come close to demonstrating that co-workers and management harassed her by purposefully making her work environment loud. Sieverding cannot create a triable issue of fact with only her unsupported speculation. *See Bank*, 829 F.3d at 666.

Without her allegations that management purposefully moved loud co-workers near her and co-workers were purposefully loud near her, Sieverding's remaining allegations fall short of showing a workplace that is "permeated with discriminatory intimidation, ridicule, and insult." *Pye*, 641 F.3d at 1018. Her remaining claims include: (1) that Boffeli shouted at her, (2) she was removed from training duties, (3) her phone calls were disrupted, (4) Boffeli commented about her accommodation, (5) Boffeli called her special, (6) Prine called her a liar, (7) co-workers said it was unfair for her to choose her own workstation and (8) co-workers watched her to see if she would do anything wrong. These allegations, except for the claim she was removed from training duties,[11]

---

[11] I will explain below, in relation to Sieverding's retaliation claim, why being removed from training duties is not an adverse employment action. For now it is enough to conclude that

amount to "[s]imple teasing, offhand comments, and isolated incidents" that do not "amount to discriminatory changes in the terms and conditions of employment." *See Arraleh*, 461 F.3d at 979. They do not satisfy the Eighth Circuit's demanding standard.

Even including her allegation of three physical-touching incidents involving Boffeli does not demonstrate severe and pervasive harassment.[12] While she alleges that three incidents occurred, she describes only two of them over the approximately six years she worked for Humach. Viewing the facts in a light most favorable to Sieverding and accepting that Boffeli pushed or struck her on three occasions, these separate and isolated incidents over a period of many years do not demonstrate that the conduct was sufficiently severe or pervasive to affect a term, condition or privilege of her employment. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246–47 (11th Cir. 1999) (collecting court of appeals cases holding that behavior including occasional physical touching not enough to establish severe and pervasive sexual harassment). The alleged conduct may have been physically threatening, but it was infrequent, not severe and did not unreasonably interfere with Sieverding's work performance. Further, even if these physical altercations could show severe and pervasive harassment, Sieverding presents no evidence that they occurred because of her disability.

In short, Sieverding has not created triable issues of fact as to whether she was harassed because of her disability or whether the alleged conduct was so severe or pervasive enough to affect a term, condition or privilege of her employment. Therefore, she has not established a prima facie case and Humach is entitled to summary judgment on Sieverding's claims of harassment under the ADA and the ICRA.

---

removal from training duties, along with other alleged conduct that may be supported by the record, is not severe or pervasive enough to affect the terms, conditions or privileges of Sieverding's employment.

[12] Because I find that Sieverding cannot establish a prima facie case of harassment even if she alleged in her ICRC complaint that Boffeli physically touched her. I decline to address whether she fully exhausted administrative remedies.

## C. Retaliation Claims

Humach argues it is entitled to summary judgment on Sieverding's retaliation claims under the ADA and ICRA because Sieverding fails to tie the alleged retaliation to any protected activity. Doc. No. 21 at 23. Humach contends she instead relies on her own speculation and temporal proximity to demonstrate a causal connection between her various complaints and the alleged retaliation. *Id.* Further, Humach argues that the behavior Sieverding believes was retaliatory (purposefully putting noisy co-workers near her, co-workers deliberately being loud, removal from training, etc.) began before she ever complained to management or filed her ICRC complaint. *Id.* Humach therefore contends this behavior cannot be causally related to protected activity. *Id.* Humach further argues that the alleged retaliation, which consists of the same type of conduct underlying Sieverding's harassment claim, does not constitute adverse employment actions. *Id.* at 24.

Sieverding responds that the conduct that created a hostile work environment increased and other events occurred after she engaged in protected activity. Doc. No. 31 at 16. She claims that after she filed her complaint with the ICRC, she complained to management about: (1) being removed from training, (2) extreme noise around her, (3) not feeling safe at work due to bullying she was experiencing, (4) rarely being spoken to by management, (5) Boffeli hitting her in front of other witnesses, (6) accommodations being removed, (7) noise and distractions being at the worst level since she began working at Humach and (8) management being short with her or unwilling to help her. *Id.* at 17. Sieverding argues that Humach had a retaliatory motive because the harassment that she complained of internally and to the ICRC got worse after she complained. *Id.* at 17–18.

### 1. Applicable Standards

The ADA prohibits employers from "discriminating against any individual because that individual 'has opposed any act or practice made unlawful by this chapter or because

such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing.'" *Product Fabricators, Inc.*, 763 F.3d at 972 (quoting 42 U.S.C. § 12203(a)). Similarly, the ICRA makes it a discriminatory practice for any person to retaliate against another person "because such person has lawfully opposed any practice forbidden under this chapter, obeys the provisions of this chapter, or has filed a complaint, testified, or assisted in any proceeding under this chapter." Iowa Code § 216.11(2).

Without direct evidence of a retaliatory motive, courts analyze retaliation claims (whether under Title VII, the ADA, or the ADEA) under the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *Stewart v. Independent School Dist. No. 196*, 481 F.3d 1034, 1042–43 (8th Cir. 2007). Using the analytical construct of *McDonnell Douglas*, the initial burden is on the plaintiff to establish a prima facie case of retaliation. *Id.* at 1043. In order to establish unlawful retaliation under the ADA, the plaintiff must show that (1) she engaged in a statutorily protected activity, (2) the employer took an adverse action against her and (3) there was a causal connection between the adverse action and the protected activity. *Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013) (citing *Amir v. St. Louis University*, 184 F.3d 1017, 1025 (8th Cir. 1999)); *see also Estate of Harris v. Papa John's Pizza*, 679 N. W.2d 673, 678 (Iowa 2004) (enumerating the same elements to establish a prima facie case of retaliation under the ICRA).

In the broadest sense, "[a]n adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." *Bonenberger v. St. Louis Metro. Police Dep't*, 810 F.3d 1103, 1107 (8th Cir. 2016) (quoting *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005)). It includes, but is not limited to, "termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." *Jackman v. Fifth Judicial Dist. Dept. of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013); *see also Farmland Foods, Inc.*, 672 N.W.2d at 742 ("Conduct constituting a materially adverse

employment action . . . . includes subtle conduct such as depriving an employee of the opportunity to advance, as well as more obvious actions such as 'disciplinary demotion, termination, unjustified evaluations and reports, loss of normal work assignments, and extension of probationary period.'" (quoting *Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 862–63 (Iowa 2001))). "However, minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Jackman*, 728 F.3d at 804; *see also Farmland Foods, Inc.*, 672 N.W.2d at 742.

Causation may be established in many ways, including "evidence of discriminatory or retaliatory comments" or evidence of "a pattern of adverse action or escalating adverse actions after the protected activity." *Orluske v. Mercy Med. Ctr.-N. Iowa*, 455 F.Supp.2d 900, 922 (N.D. Iowa 2006). The timing of events, alone, may be sufficient to create an inference of retaliation, but the Eighth Circuit has typically required more than a close temporal connection to establish a retaliation claim or show that the employer's stated legitimate reason was pretext. *Wright v. St. Vincent Health System*, 730 F.3d 732, 738–39 (8th Cir. 2013). An unsupported, self-serving allegation that an employer's decision was based on retaliation cannot establish a genuine issue of material fact. *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1088 (8th Cir. 2011).

"A retaliation claim under the ADA requires a but-for causal connection between the employee's assertion of her ADA rights and an adverse action by the employer." *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 758 (8th Cir. 2016). In other words, the plaintiff must show the protected conduct was a determinative, not just motivating, factor in the employer's decision. *Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144, 1148 (8th Cir. 2008); *see also Wright*, 730 F.3d at 737. By contrast, to prove causation under the ICRA, the plaintiff must show that the protected conduct was a "motivating factor" in the employer's adverse employment decision. *Haskenhoff v. Homeland Energy Solutions, LLC*, 897 N.W.2d 553, 635–37 (Iowa 2017); *see also Johnson v. Mental Health Institute*, 912 N.W.2d 855 (Table), 2018 WL 351601, at *8 (Iowa Ct. App. Jan.

10, 2018) (summarizing the multiple opinions in *Haskenhoff* and concluding that the motivating factor standard now applies to retaliation claims just as it does to discriminatory discharge claims).

If the plaintiff establishes a prima facie case, then the burden shifts to the defendant to show a "non-retaliatory reason for the adverse employment action." *Stewart*, 481 F.3d at 1043. If the defendant can show a legitimate, non-retaliatory reason for its actions, then the burden returns to the plaintiff to present evidence that "(1) creates a question of fact as to whether defendant's reason was pretextual and (2) creates a reasonable inference that defendant acted in retaliation." *Id.* (quoting *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir. 2005)).

### 2.    *Discussion*

The parties do not dispute that Sieverding engaged in protected activity. The parties dispute whether Sieverding can establish the two other elements of a prima facie case of retaliation: (1) whether Sieverding suffered adverse employment action and (2) whether there was a causal connection between the adverse action and the protected activity. I will address both issues below.

### a.    *Adverse Employment Actions*

The removal of Sieverding from training duties does not constitute an adverse employment action, as this change did not materially disadvantage Sieverding. It did not result in her pay or hours being reduced, nor did it result in a change of job title. At most, this was a minor change in work responsibilities that did not make her workload any more difficult. The majority of her job duties remained the same. *See Spears v. Missouri Dept. of Corrections and Human Resources*, 210 F.3d 850, 853 (8th Cir. 2000) ("Minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities" are not adverse employment actions."); *see also Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 633 (8th Cir. 2016).

Sieverding contends that management rarely spoke to her and was short or unwilling to help her after she complained. This also does not constitute an adverse employment action. *See Garang v. Smithfield Farmland Corp.*, No. C18-4082-LTS, 2020 WL 701986, at *11 (N.D. Iowa Feb. 12, 2020) ("Completely depriving an employee from access to supervisors or HR, and the remedies they are responsible to provide, would likely constitute an adverse employment action."). Sieverding does not allege management entirely refused to speak with her following her complaints. Indeed, the record contains numerous emails between Sieverding and management after she filed her complaint.

Further, Sieverding "not feeling safe at work due to bullying" does not constitute an adverse employment action. While Sieverding is unclear about what type of bullying she experienced, it appears she is complaining about co-workers being rude to her, making rude comments about her and being loud around her. Offensive comments and conduct by co-workers, when not connected to a discrete act that affects the conditions of employment, generally do not constitute an adverse employment action. *Kelleher*, 817 F.3d at 634 (unspecified discriminatory statements, random looks and eye rolls did not constitute adverse employment action); *O'Brien v. Dep't of Agric.*, 532 F.3d 805, 809 (8th Cir. 2008) (verbal harassment and increased scrutiny do not rise to the level of affecting the terms or conditions of one's employment); *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 617 (8th Cir. 2007) (workplace pranks, and a few racial epithets, by co-workers did not rise to the level of an adverse employment action); *Jones v. Fitzgerald*, 285 F.3d 705, 714 (8th Cir. 2002) ("personal animus, hostility, disrespect, and ostracism" did not rise to the level of an adverse employment action); *Thomas v. State of Iowa Child Support Collections*, No. 08-0722, 2008 WL 5484349, at *6 (Iowa Ct. App. Dec. 31, 2008) ("disparate scrutiny, criticisms, informal verbal reprimands, negative attitude, and disparaging public remarks" did not constitute an adverse employment action when not connected to a disciplinary action or change to material

conditions of employment). The type of conduct Sieverding characterizes as "bullying" falls short of being an adverse employment action.

### b. *Causation*

Viewing the facts in a light most favorable to Sieverding, the allegedly retaliatory conduct has no causal relationship to her complaints. Sieverding has not shown that her co-workers bullied her or were purposefully loud near her due to her complaints. Nothing in the record indicates her co-workers were aware of her complaints. Sieverding made her internal complaints to members of management, and co-workers would have no way of knowing about them unless they were told about the complaints. Co-workers also would not have known about her ICRC complaint unless they were told. There is no evidence suggesting they were ever told this information. Co-workers could not have retaliated against Sieverding for complaints that were unknown to them.

Sieverding's allegations that Boffeli hit or pushed her on three occasions predate her ICRC complaint and the internal complaints she made about him harassing her. The two physical incidents she actually describes took place in the summer and fall of 2016. The ICRC complaint was filed on April 18, 2017, and there is no evidence that she complained that Boffeli harassed her until after the altercations occurred. Further, Sieverding complained about being removed from training on numerous occasions before she filed her ICRC complaint. *See* Doc. No. 35 at 12; Doc. No. 35-1 at 10–11; Doc. No. 31-3 at 7.

There is also no causal connection between noise levels and the alleged removal of her accommodation and her ICRC complaint and internal complaints. The very basis of most of Sieverding's internal complaints was noise and her accommodation. She could not have been retaliated against for behavior that predates her complaints. Sieverding does allege that noise levels and distractions got worse after she filed her ICRC complaint. Doc. No. 31 at 17. Even though this is conduct that allegedly occurred after she filed

her ICRC complaint, she still fails to demonstrate her ICRC complaint was either a but-for or motivating factor for the increased noise levels and workplace distractions.

The record demonstrates that Donar, Boffeli, Bauer and Prine knew about the ICRC complaint. *See* Doc. No. 19-2 at 135, 137, 166. There is no evidence that other members of management or any other employees knew about Sieverding's ICRC complaint. Sieverding is unclear about why the noise and distractions around her were increasing, or who was responsible for the increase. If the increase was because of employees other than Donar, Boffeli, Bauer and Prine being loud or placing loud co-workers near her, then Sieverding has not demonstrated that her ICRC complaint is a but-for or motivating factor for the behavior. She does not present any fact tending to demonstrate that they were aware of her ICRC complaint.

Further, even if the increase in noise and distractions could somehow be tied to Donar, Boffeli, Bauer, Prine or any other employee who knew about Sieverding's ICRC complaint, there is no fact indicating the increased noise and distractions was *purposefully* done because of, or was motivated by, the complaint. *See Jensen v. IOC Black Hawk Cty. Inc.*, 745 F. App'x 651, 653 (8th Cir. 2018) (per curiam) (causation element was not established when there was no evidence of animus tied to plaintiff's complaints). The only link Sieverding can point to is temporal proximity between the increased noise and her ICRC complaint. While the temporal proximity is somewhat close (Humach became aware of the ICRC complaint on April 26, 2017, and Sieverding filed an amended complaint alleging retaliation on July 26, 2017), this is not enough to establish the ICRC complaint was the but-for cause or motivating factor for the increased noise and distractions. *See Tyler v. University of Arkansas Bd. Of Trustees*, 628 F.3d 980, 986 (8th Cir. 2011) ("The inference [of retaliation] vanishes altogether when the time gap between the protected activity vanishes altogether when the time gap between the protected activity and the adverse employment action is measured in months."). Sieverding presents no other evidence that the increased noise around her workstation was caused by her ICRC complaint.

Sieverding attempts to argue that the "entire sequence of events leads to the inescapable inference that Humach's motive was retaliatory." Doc. No. 31 at 19. This is incorrect. As explained above, many actions Sieverding complains of clearly do not constitute adverse employment actions, and all lack a causal relationship to her ICRC complaint and internal complaints. As I have already discussed extensively above, Sieverding has not demonstrated that any of the alleged behavior she experienced was tied to discriminatory animus.

Viewing the facts in a light most favorable to Sieverding, she has not demonstrated a prima facie case of retaliation under the ADA and ICRA. Humach's motion for summary judgment on those claims will be granted.

## D.    *Interference with FMLA Rights Claim*

Humach argues it is entitled to summary judgment on Sieverding's claim that it interfered with her right to take FMLA leave because it allowed her to take all leave to which she was entitled. Doc. No. 21 at 26. Humach contends that it always permitted her to take approved intermittent FMLA leave. *Id.* Humach claims that when it denied requested leave, it was because the leave did not qualify as FMLA leave under the FMLA certifications received from Dr. Lutze. Doc. No. 37 at 6.

Sieverding argues that the record demonstrates that she was sometimes not allowed to take FMLA leave due to her emotional issues. Doc. No. 31 at 19. She argues Humach inappropriately interpreted her FMLA certifications to mean that she could take leave only for emotional issues related to the death of her niece and she should have been allowed leave whenever she was dealing with emotional issues of any nature that prevented her from doing her job. *Id.*

### 1.    *Applicable Standards*

"The FMLA entitles an employee to twelve weeks of leave from work during any twelve-month period if the employee meets certain statutory requirements." *Pulczinski*

*v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012) (citing 29 U.S.C. § 2612(a)(1)). An employee is entitled to FMLA leave if she is suffering from "a serious health condition that makes the employee unable to perform the functions of [her] position." 29 U.S.C. § 2612 (a)(1). Section 2615(a)(1) makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise" rights provided under the FMLA. Section 2615(a)(2) makes it unlawful for "any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA.

The Eighth Circuit has recognized three types of claims arising under Section 2615(a)(1)–(2): (1) entitlement claims, (2) discrimination claims and (3) retaliation claims. *Johnson v. Wheeling Machine Products*, 779 F.3d 514, 517 (8th Cir. 2015). In an entitlement claim, "an employee alleges a denial of a benefit to which he was entitled under the statute[.]" *Id.* Sieverding's interference with FMLA rights claim appears to be an entitlement claim because she alleges she was not allowed to take FMLA leave she was entitled to. To state an entitlement claim, Sieverding must show (1) she was eligible for FMLA leave, (2) her employer was on notice of her need for FMLA leave and (3) her employer denied her benefits to which she was entitled to under the FMLA. *Hasenwinkel v. Mosaic*, 809 F.3d 427, 432 (8th Cir. 2015).

"Employees [] have an affirmative duty to indicate both the need and the reason for the leave, and must let employers know when they anticipate returning to their position." *Scobey v. Nucor Steel-Arkansas*, 580 F.3d 781, 786 (8th Cir. 2009) (quoting *Woods*, 409 F.3d at 990-91). Once an employer is put on notice that an employee is requesting FMLA leave, the employer may treat the leave as FMLA leave without additional information, or it may "inquire further to determine if the leave is because of a serious health condition and may request medical certification to support the need for such leave." *Parsons v. Principal Life Ins. Co.*, 686 F. Supp. 2d 906, 913 (S.D. Iowa 2010) (quoting 29 C.F.R. § 825.302(c)). Specifically, an employer may require that a request for intermittent leave due to a serious health condition be supported by a

certification issued by the health provider of the employee that leave taken is appropriate. 29 U.S.C. § 2613(a). The certification is sufficient if it states: (1) the date on which the serious health condition began, (2) the probable duration of the condition, (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition, (4) a statement that the employee is unable to perform the functions of his position and (5) a statement of the medical necessity for the intermittent leave and the expected duration of the intermittent leave. 29 U.S.C. § 2613(b). If there is a defect in the certification the employer may not summarily deny an FMLA leave request and has an obligation to inform the employee and grant her a "reasonable opportunity to cure" the certification. *Parsons*, 686 F. Supp. 2d at 916 (citing 29 C.F.R. § 825.305(d)).

### 2.    *Discussion*

I find that Sieverding has raised a triable issue of fact as to whether Humach improperly denied her FMLA leave. She has put forth facts showing that she was eligible for FMLA leave because of a serious health condition. There is evidence that she suffered from depression and other emotional issues that sometimes made her unable to take phone calls as part of her job. Sieverding's testimony, along with evidence of email communications, demonstrate that she requested FMLA leave. Finally, she testified that in July and August of 2015, and on other occasions, she was denied FMLA leave when she requested it to deal with emotional issues.

A major point of dispute between the parties is whether Humach correctly interpreted Sieverding's FMLA certifications as permitting her to take time off only due to emotional issues that related to the death of her niece. However, even if Humach is correct and the FMLA certifications did not certify leave for emotional health issues unrelated to Sieverding's niece, Humach should have allowed Sieverding the opportunity to cure the defect. *See Parsons*, 686 F. Supp. 2d at 916. Instead, viewing the facts most favorably to Sieverding, Humach denied the requested FMLA leave with no further investigation. Reasonable jurors could find Humach was on notice that Sieverding was

requesting FMLA leave based on her emotional issues and was required to either approve the request or undertake additional investigation to determine whether the requested leave was covered by the FMLA. Humach did not do so, but instead summarily denied FMLA leave based on the FMLA certification it had on file without inquiring further and without giving Sieverding the opportunity to correct the FMLA certification or get a new one.

However, Sieverding's entitlement claim as her discharge on December 12, 2017, has no merit. It is uncontested that she exhausted her FMLA leave on November 11, 2017. Doc. No. 31-1 at 22. It was impossible for Humach to deny Sieverding benefits to which she was entitled to under the FMLA after that date because she had no FMLA leave remaining. Thus, to the extent Sieverding makes an entitlement claim regarding her discharge on December 12, 2017, Humach is entitled to summary judgment. Humach is not entitled to summary judgment as to the claim that it refused to allow Sieverding FMLA leave on other occasions when she requested intermittent leave due to emotional health issues.

### E.     *FMLA Retaliation Claim*

Humach argues it is entitled to summary judgment on Sieverding's FMLA retaliation claim because, following the exhaustion of her FMLA leave, it allowed Sieverding to remain on leave for approximately one month and then made the decision to terminate her employment because she could not provide a return-to-work date. Doc. No. 21 at 28. Humach contends there is no evidence that its decision was motivated, in any way, by Sieverding's use of her FMLA leave. *Id.*

Sieverding responds that Humach did not want her back after she exhausted her FMLA leave. Doc. No. 31 at 20. She argues Humach misled her by telling her that if she obtained an appropriate doctor's clearance her leave would be extended. *Id.* She claims Donar specifically told her not to come back to work and that she would receive workers' compensation benefits. *Id.*

## 1.    Applicable Standards

While Sieverding calls her claim a "retaliation" claim, it appears to be "discrimination" claim.  A retaliation claim arises "if an employer takes 'adverse action' against an employee who 'opposes any practice made unlawful under the FMLA—for example, if an employee complains about an employer's refusal to comply with the statutory mandate to permit FMLA leave.'"  *Brown v. Diversified Dist. Systems, LLC*, 801 F.3d 901, 909 (8th Cir. 2015) (quoting *Pulczinski*, 691 F.3d at 1005).  By contrast, a discrimination claim arises "'when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA.'"  *Id.* at 908 (quoting *Pulczinski*, 691 F.3d at 1006).

Thus, the only real difference is the nature of the activity that allegedly prompted the adverse action.  If the plaintiff simply exercised FMLA rights, and suffered adverse action as a result, the claim is a discrimination claim.   If the plaintiff opposed or complained of an employer's unlawful practices under the FMLA, and suffered adverse action as a result, the claim is a retaliation claim.  Here, Sieverding seems to argue that her protected activity was requesting and taking FMLA leave.  Doc. No. 31 at 20.  Thus, her claim is an FMLA discrimination claim.

Ultimately, the precise label is of little import because both types of claims are analyzed under the *McDonnell Douglas* burden-shifting framework.  *Brown*, 801 F.3d at 908–09.  "To establish a prima facie case of FMLA discrimination, 'an employee must show: (1) that he engaged in activity protected under the Act, (2) that he suffered a materially adverse employment action, and (3) that a causal connection existed between the employee's action and the adverse employment action.'"  *Id.* at 908 (quoting *Pulczinski*, 691 F.3d at 1007).   The third element requires proof that the plaintiff's exercise of FMLA rights "played a part" in the employer's decision.  *Pulczinski*, 691 F.3d at 1007.  If the plaintiff establishes a prima facie case, the employer must articulate

a legitimate, non-discriminatory reason for the adverse action and the plaintiff must then present evidence allowing a finding that this stated reason is mere pretext for discrimination. *Brown*, 801 F.3d at 909; *Pulczinski*, 691 F.3d at 1007.

An employee can establish pretext in various way, including by showing that (1) the proffered reason has no basis in fact, (2) the employee received a favorable review before being fired, (3) that similarly situated employees were treated differently, (4) the employer changed their reason for discharging the employee or (5) the employer deviated from its policies. *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006) (citing *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002)).

### 2. *Discussion*

Humach does not dispute that Sieverding engaged in protected activity in requesting and using FMLA leave. Doc. No. 21 at 28. Nor does it dispute that her termination was an adverse employment action. *Id.* The dispute is whether Sieverding can show her use of FMLA leave "played a part" in Humach's decision to terminate her employment. However, even assuming Sieverding can establish a prima facie case of FMLA discrimination, she has failed to present evidence from which the jury could find that Humach's stated reason for discharge is mere pretext. Humach has provided a legitimate, non-discriminatory reason for Sieverding's termination—she failed to return to work after her FMLA leave was exhausted and failed to provide Humach a date on which she would return to work. *See Beckley v. St. Luke's Episcopal-Presbyterian Hospitals*, 923 F.3d 1157, 1160 (8th Cir. 2019) ("Taking FMLA leave, however, does not give an employee greater protections against termination for reasons unrelated to the FMLA than was available before.").

Sieverding attempts to argue that Humach did not want her back after her FMLA leave because it misled her by indicating that if she got appropriate doctor's clearance her leave would be extended but she was later told not to return to work. This argument fails because there is no evidence in the record that Humach "misled her" about doctor's

clearance. The only fact that comes close to this allegation is that Sieverding "received a letter from Humach dated November 16, 2017, inquiring about her return to work date and asking for an update from [her] physician." Doc. No. 35 at 31. Nothing about this fact indicates that Humach said or implied that if Sieverding had a doctor's approval she could take extended leave after her FMLA leave was exhausted.

The record does support Sieverding's allegation that she was told by Donar not to return to work after Dr. Lutze provided Humach with a letter on December 5, 2017, which explained that Sieverding would not return to work until further notice. Doc. No. 19-2 at 175. However, this fact alone does not show that Humach's reason for her termination was pretext. Sieverding had been on non-FMLA leave for more than three weeks before December 5. Donar's statement shows, at most, that the decision to terminate her employment was made a few days before she received her termination letter on December 12, 2017. Sieverding offers no other argument as to whether Humach's proffered reason for terminating her employment could be pretext. She does not dispute that she had been on non-FMLA leave for nearly a month. Nor does she argue that similarly situated employees were treated differently, that Humach changed its reason for her discharge, or that Humach deviated from its policies.

Further, Sieverding fails to demonstrate pretext because she admits that she "could not return to work because she could not even go near the building without having a massive panic attack," as she "was emotional, she couldn't think right, she had several panic attacks where she blacked out." Doc. No. 35 at 30. "An employer may lawfully terminate an employee if, after the employee exhausts FMLA leave, she is 'unable to perform an essential function of the position because of a physical or mental condition.'" *Hasenwinkel*, 809 F.3d at 433 (quoting 29 C.F.R. § 825.216(c)).

Viewing the facts in a light most favorable to Sieverding, she has not created a triable issue on whether Humach's reason for her termination was pretext. Humach is entitled to summary judgment on Sieverding's claim of FMLA retaliation.

## VI.    CONCLUSION

For the reasons set forth herein:

1.    Humach's motion (Doc. No. 19) for summary judgment is **granted in part** and **denied in part**, as follows:

   a.    As to Counts I and II, the motion is **denied** as to Sieverding's claims under the ADA and ICRA that Humach failed to accommodate her disability by providing a quiet work environment.  However, the motion is **granted** as to Sieverding's claims under the ADA and ICRA that Humach failed to accommodate her disability with an indefinite leave of absence and as to Sieverding's claims of harassment and retaliation under the ADA and ICRA.

   b.    As to Count III, the motion is **denied** as to Sieverding's claim of FMLA entitlement based on the denial of intermittent FMLA leave due to emotional health issues.  However, the motion is **granted** as to Sieverding's claim of FMLA entitlement based on her need for an indefinite leave of absence and as to Sieverding's claim of FMLA retaliation.

2.    This case shall proceed to trial as scheduled as to the following claims: (1) Humach's failure to accommodate Sieverding's disability under the ADA and ICRA by providing a quiet work environment and (2) Humach's denial of FMLA leave due to Sieverding's intermittent emotional health issues.  All other claims are hereby **dismissed**.

**IT IS SO ORDERED.**

**DATED** this 27th day of February, 2020.

_____
Leonard T. Strand, Chief Judge